hear me? Yes. Okay, great. Thank you very much. Would you like me to go ahead and open court now or? Well, we're about a minute before our appointed time, but it looks like everyone is present. So yes, go ahead and proceed to open court this morning. The Honorable, the judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Good morning, everyone. And counsel, once you know the court, really appreciate you making yourselves available for our remote argument this morning. And with that, we will hear from the appellant, Mr. Tan. Actually, Your Honor, I represent the appellee. So I believe Mr. Ensign is first. Okay, I've gotten him reversed. My apologies. Mr. Ensign, are you ready to proceed? I am, Your Honor. Thank you. Okay. Thank you. Good morning. May it please the court, Drew Ensign, Deputy Assistant Attorney General for the United States. I would like to reserve four minutes for rebuttal. In the landmark 1996 Iowa statute, Congress specifically sought to end the differential and more favorable treatment given to aliens that unlawfully cross our borders and successfully make it into the interior of the country. As the Ninth Circuit has explained, Congress in Iowa has sought to, quote, ensure that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings, end quote. One of the ways that Congress equalized treatment for unadmitted aliens was providing for mandatory detention pending removal proceedings for everyone, whether they had lawfully presented themselves at ports of entry or unlawfully snuck past our borders. Congress did so in subsection A-1 by providing that all aliens that have not been admitted are deemed, quote, applicants for admission, end quote. Subsection B-2 then mandates detention for aliens that are seeking admission, which applicants for admission necessarily are by definition. They have pending applications for admission by operation of law. As the Fifth Circuit correctly recognized recently, quote, when a person applies for something, they are necessarily seeking it, end quote. If specifically defining aliens as applicants for admission were not enough to resolve this issue alone, however, subsection A-3 makes plain that applicants for admission are a subset of aliens who are seeking admission. It does so by requiring inspection of, quote, all aliens, dot, dot, dot, who are applicants for admission or otherwise seeking admission, end quote. As courts have repeatedly recognized, such as these 11 circuits sitting on bonk, sorry, 11 circuits sitting on bonk in the Villarreal case, quote, or otherwise means the first action is a subset of the second action, end quote. Or as the Second Circuit put it, the Seventh Circuit put it in clear, quote, the phrase or otherwise operates as a catch all. The specific items that proceeded are meant to be subsumed by what comes after the or otherwise, end quote. Congress's or otherwise structure in subsection A-3 thus necessarily means that all applicants for admission are necessarily seeking admission under 1225, and that's subject to mandatory detention. If this circuit correctly held that section 1225 mandates detention two weeks ago, and the Buenostro-Mendez decision, this court should hold otherwise. This side holds likewise, and with that, I welcome the court's questions. And so I've got a question that's somewhat of a background question, maybe to help put your argument in context. The Fifth does not require the Attorney General to release detained aliens on bond. So my question is, if 1226 does not require release on bond, what is the procedural or other reason that the government wishes to use 1225 instead of 1226? It's not so much a desire as we believe that's what the Congress has mandated. Congress in 1225 uses shall construction, and so where 1225 applies, we don't think the government has discretion to use 1226-A discretionary authority, given that Congress has used mandatory language in 1225, but that controls, you know, and as a general matter of statutory interpretation, the specific controls over the general. We don't read petitioner to dispute that 1225, where it applies is mandatory, and I believe they can see that it does apply to people that are apprehended at the border. So where 1225 applies, it doesn't seem to be genuinely disputed that it's subject to mandatory detention and bonds is not available. I think that is clear, but my question is really more on 1226. Is it discretionary or is a bonding mandatory under 1226? And if it's not mandatory, it seems like it's being treated as mandatory. We don't believe it's mandatory as a matter of statute. There are regulations that require, where 1226 applies, that bond hearings are available. Those regulations could potentially be changed, but as it presents now, there are regulations that require availability of bond hearings generally, where 1226-A applies, and thus the dispute that's kind of crystallized here is, is it 1225 or 1226-A? Go ahead, go ahead Judge Rask. I was wondering whether a warrant was issued prior to the petitioner's detention here, as would appear to be required under 1226-A. I don't know the question offhand. I'm not, it's certainly not a live issue that has been presented as a basis for relief here. I'm happy to check that and get back, but I don't, I don't specifically know the answer to that other than it wasn't a basis for the district court's decision, and it wasn't relied upon as a basis for relief. Thank you. You would concede that under 1226, that the availability of a bond hearing would not impact the, whether or not a bond is granted. The bond is not mandatory, that just a hearing would be mandatory, right? As a matter of the current regulations are enforced, that's correct. Although I think there's an important point there, which is that I read petitioners as saying that a fundamental aspect of 1226 is that bond is available, but that's actually not what Congress provided by statute. The availability of bond hearings is a creature of regulation and not something that Congress in fact mandated, which I think further underscores that it was not actually something that Congress intended. If I may, you know, I think it's important to understand too, that the contrary interpretation advanced by petitioners would have precisely sort of perverse results that Congress sought to eliminate. Specifically under his view, aliens that lawfully present themselves at ports of entry would be subject to mandatory detention under section 1225. But aliens that unlawfully barge past our borders, thereby committing the crime of unlawful entry, would have adversely possessed the right to a bond hearing by virtue of their illegal actions. Congress specifically sought to eliminate this preferential treatment for illegal actions in Niagara, and I think that's a policy choice that should be respected here. Mr. Insight, as I understand the government's position, the position is that applicant for admission is a subset of those seeking admission. Can you give an example of someone who is seeking admission who is not an applicant for admission? Your Honor, there are potentially some examples. One that we recited to our brief that is, there are instances where if you are an LPR and leave the country for more than a year, when you present to the border, you are considered to be seeking admission, but they wouldn't necessarily be an applicant for admission. So I think that's an example that we presented. I think stowaways are potentially another example. It ultimately, I don't think matters because of the logical relationship because of the all or otherwise structure. It's necessarily a subset of it, and you know, whether those Venn It's at least the case that those that are applicants for admission are necessarily seeking admission. And that's underscored, I think, too, not just in A3, but there's further textual clues about that. A5 as well, which refers to the oath, also uses that same structure where applicants for admission are seeking admission. A4 further underscores that an application for admission can be voluntarily withdrawn, which supports our position that you have an application pending by operation of law. The fact that you can withdraw it, you know, suggests that you have something pending, and certainly if you have a pending application, it makes absolute sense that you are seeking admission. Council, when you make up the language in 1225, let's see, 1225B2B, that it calls out these exceptions for crewmen and stowaways. What's your thought as to why that language is there if these provisions in 1225 are really looking to the situation where an alien is apprehended in the interior of the country? I don't know that it has specific applications as to the interior of the country. I mean, these are broad provisions. Certainly stowaways wouldn't typically be apprehended in the interior of the country, or I think at that point they would not necessarily be, you know, considered to be a stowaway if they had also made it off the ship and into the country. Certainly those are categories that Congress has carved out specifically for specific treatment. So I think that's just really kind of carrying that specific treatment for stowaways forward to have a specific provision for them. I don't know that there's a lot more intent that can really be discerned from that policy choice. But stowaways can arrive in the interior of the country, right? I mean, you can have a stowaway that gets off a ship on the Great Lakes. You can get a stowaway that gets off an aircraft in the middle of the United States with an international flight to Lake Memphis from someplace in South America. That's all possible. But is there a definition that says stowaways are something different that I've missed? No, I believe that's certainly correct, Your Honor. And to be candid with you, I'm not sure where that dividing line on stowaways, if they maintain their stowaway status, no matter how long they, you know, successfully stay in the interior of the country or where that dividing line is. It's certainly not a live issue presented here. It's one that is interesting to think about, but I don't think it actually controls the boundaries that were kind of need to be set by this. Yeah, I get that too about the question. It wasn't allowed there. Not at all. Well, if I may, I'd like to reserve the remainder of my time for a vote. All right, you may. Thank you. Mr. Tan, you may proceed. Thank you, Your Honor. Good morning. May it please the Court. Michael Tan on behalf of Mr. Herrera Avila. This case is about whether Congress in 1996 said that non-citizens who enter the country without inspection have to be detained. No, Congress did create a detention mandate for aliens with crimes and it was so concerned about the impact that mandate would have on the system that it delayed implementation for two years. But on the government's view, the same Congress also created a detention mandate larger by several orders of magnitude that applies to millions of people and that somehow escaped everyone's notice for the last 30 years. That's not what Congress did in 1996 or any time since. Instead, all three branches have understood that Congress preserved the executive's discretion under 1226. The Supreme Court decided Jennings against that backdrop. Five administrations, including the first Trump administration, understood the statutes this way. And just last year in the Lincoln-Rineway Act, Congress reaffirmed this bipartisan understanding. Here, what the executive is doing is abandoning the choice Congress made in order to advance its own policy goals. And it's doing that despite more than 370 federal judges rejecting the government's overreach here. I do have a question about that. Doesn't your position return us to the pre-Iowa framework where those who enter the country without permission gain a procedural advantage over those who seek to enter lawfully? So, Your Honor, our position would preserve bond hearings for people who enter unlawfully, which is what Congress did in amending 1226 to include those people and also stated in the relevant legislative history, but it was restating the detention provisions. The government's saying that's contrary to what Congress wanted to do, that it must have created this detention mandate for millions of people to deter unlawful entry. So if I sneak into the country and hide in the interior, I get released on bond, but if I show up at the border and voluntarily avail myself of the unlawful entry procedure, I don't. Well, yes, Your Honor, that's the choice Congress made. And of course, there's room for reasonable disagreement about how to design the system here, but Congress chose to impose mandatory detention on people seeking admission at the border and then found inadmissible, not allowed to come to the country while preserving bond hearings for people like Petitioner, who has lived here for 20 years. And so it's not the choice Congress had to make, but it's the choice Congress did make, and there are reasons for why it made that choice. First and foremost, we know from IRA-IRA that Congress was so concerned about the impact detention mandates would have on the system that it delayed implementation of the one it did actually pass for several years. This one would crash the system. It's millions of people that would be subject to this. Congress also took other steps, created new steps to deter unlawful entry, and first and foremost is the expedited removal provision, which neighbors 1225b2 and 1225b1, and for decades the government has used that provision to put recent border crossers into mandatory detention and subject them to fast-track deportations. The last point I would make here, Your Honor, is it's not like 1226 is some kind of get-out-of-jail-free card. We all agree Petitioner can be detained, and the government detains people under 1226 all the time. The only question is whether they're eligible for bond, and under the regulations, whether they get a bond hearing. The statute does provide for bond, just to correct, to address the discussion from the earlier point of view. They may be detained, or they may get deported. Right, and that's right. It's discretionary, and that's typically up to the government's own immigration, not typically, but it's up to the government's own immigration judges to decide whether the person should be detained. So that's the choice Congress made here, and it's certainly reasonable that they would decide to provide bond hearings for someone who's been living here for a while, like Petitioner, someone who's been here for 20 years, while denying bond hearings to people who have come to the border and are found to be not allowed to come in. Again, it's not the choice they had to make, but it's the choice they did make, and the executive can't depart from that choice just because they don't like it. If I may, I wanted to go back to the textual arguments, because I really think that makes clear what's wrong with the government's position here. So their core position is that all applicants for admission have to be seeking admission, and that just flies in the face, essentially writes out the definition of admission from the statute. So Congress defined admission at 1101A13A to refer to a lawful entry into the country upon inspection by an immigration officer. So it's very clear that seeking admission, which means going after or requesting or attempting to obtain something, seeking an admission, a lawful entry into the country after inspection, has to refer to people of the border. That's people who are coming to a port of entry, maybe on a tourist visa or some other visa. That's also people who cross the border and walk up to Border Patrol, or it's people who cross the border and are apprehended on what the Supreme Court has described as a threshold of entry, so proximate to the border. They haven't yet effected an entry, but they still want to come in when they get arrested. All of those people are subject to this detention rule under 1225B2. Someone like Petitioner, who's been here for 20 years, is clearly not seeking admission into the country. He's already in the country. And that's why for the last three decades, every branch of government has understood 1226 to be the governing statute for someone in this situation. A number of courts have agreed with you, Mr. Tam, but how do you get around the text of 1225B3? Right, so this is all aliens who are applicants for admission who are otherwise seeking admission, shall be inspected. Right. So this is the inspection provision, Your Honor, and we actually think on further reflection that provision supports us more than it does the government. And this is a different reading than the one we put forth in our brief. I want to be candid about that. But the problem with the government's reading, much like its reading of 1225B2, is that it renders text in the statute surplusage. So the government's position is that an applicant for admission is a subset of seeking admission. Grammatically, that's a little odd because they're mixing up different parts of speech, but that's their position. The problem with that is that literally renders the reference to applicants for admission surplusage. Congress could have just left that out of the statute and said people seeking admission, readmission, or transit through the United States must be inspected. The only way to avoid surplusage in the statute is if you understand, and this is consistent with 1225A1, if you understand applicants for admission to include some people who are seeking admission at the border because they come to the port or just crossed, or as well as people who aren't seeking admission because they're already present in the country. That's the only way to avoid surplusage in the statute. And so properly read, the statute requires the inspection of all applicants for admission, those who are seeking admission, and those who aren't, as well as any other alien who's seeking admission, readmission, or transit through the country. And so for the government, they just cited the example of a returning lawful permanent resident who's coming from a trip abroad. In the government's view, that's someone who is not an applicant for admission, but seeking admission. There may be other examples. The statute makes clear Congress thinks that these are different categories of people. So we actually think A3 supports the plain reading that we're advancing here, which is also, again, consistent with the three decades of how the statute has been understood and applied. So counsel, along those lines, I'm having a little trouble understanding the argument with respect to 1225A1, and the definition of applicant for admission. And that definition begins with the statement that an alien present in the United States who has not been admitted, then it says, or who arrives in the United States. Now, that first phrase, isn't that a pretty broad grouping of people that would include both individuals at the border who have not been admitted, as well as individuals in the interior of the country? So is there a way to begin with this? Yeah, that's a good question, Your Honor. Of course. So I think if this statute means what you say it does, why isn't that first phrase simply deleted? Well, I think what Congress is doing here, so you're right, that Congress deemed, it's really three categories of people, applicants for admission. So people who are present in the country without an admission or parole, I believe. And then people who arrive in the country, arrive in the United States at a port of entry or outside a port of entry. And so, in all of you, the people who are present in the country are the people who have affected an entry. And the arriving language describes people who have not yet affected an entry into the country. And the statute clearly contemplates that those people, that's the people who present at a port of entry, as well as people who cross the border between the ports of entry. So that's how we would map the categories of people that Congress is describing here. And our client is someone who's present in the country without an admission. He's been here for 20 years. Does that answer your question, Your Honor? Well, I understand. I think I understand your answer. Let me ask you another question. Would you agree that the petitioner here, the appellee, falls within this definition that an alien present in the United States has not been admitted? Yes. Yes, Your Honor. But that's not sufficient to subject him to mandatory detention under 1225b2, because that statute refers to an applicant for admission who is seeking admission. And our client is not seeking admission under the 1225b2. Okay, well, let's go to that then, to the seeking admission. And I understand what you're saying here, that the seeking admission is the thing that triggers the potential detention here. And I've read in the briefing that, I think I understand this correctly, that your definition of seeking admission is someone who has begun the process, they've begun the legal process of seeking and obtaining legal admission into the country. And so my question is this, if that is so, isn't it somewhat odd that an individual who is at that point trying to follow the requirements of the law and has begun the lawful admission process, beginning the paperwork, we might say, isn't it odd that that is the person that would be detained? Under 1225b2, yes, Your Honor. I mean, so this goes back to the discussion we were having earlier. We think that's the choice Congress made, and it was reasonable for them to kind of maintain the existing detention architecture. The other point I would make here is that, in our view, the statute covers not only people who are presenting sort of at the port of entry, but also recent border crossers, so people who cross the border unlawfully and even walk up to a Border Patrol agent or apprehended, but are still seeking to enter the country upon inspection by the officer. And that's really what admission refers to here, sort of a procedurally regular admission, not that you have some substantive entitlement to come to the country, but you're going through an inspection by an officer. That's what an admission is. We operate in the briefing that your contention is that this petitioner does not fall within the definition of someone seeking admission. That's right, because he's already here. Because he's not, I think I read in the briefing, because he is not engaged, and I won't run it out here, actively engaged in admission procedures. That's right, your honor. And that status, you say, is what saves him from falling under this provision that requires, potentially requires detention. And getting back to my question, that just seems to be very odd analysis here, that an individual who is actively engaged in admission procedures would be the one that we might say is automatically detained. Well, that may be an odd result, your honor, but Congress doesn't pursue its goals at all costs, and Congress had to make choices. And one of the implications, again, of the government's new mandatory detention rule is literally millions of people in the country are now subject to mandatory detention, and it's implausible, frankly, that the 1996 Congress did that. I mean, it's implausible on the text, it's implausible on the legislative record, that Congress was so concerned about 45,000 aliens being detained under 1226C every year in a detention mandate it did enact, that it had to defer that implementation. It was a big deal in 1996. There's simply no way that Congress also put this elephant in the mouse hole, to use the familiar, to use, to quote Whitman, it just didn't happen. That's not what, and that's why for the last 30 years, this has been the system in place, and even the first Trump administration thought so. So this is really, this is a radical departure from how the system has worked since the enactment of the 1996 Act. I see my time has elapsed. Why would you think, interestingly enough, what would be, how would you believe what is in the legislative history, for example, that there was a concern on the part of Congress that there would be intensified enforcement of immigration law and millions and millions of individuals apprehended in the interior of the country, when that, I think we would all agree, has not been the record or the history of the enforcement of the nation's immigration laws. Why would the Congress be concerned or even be thinking about that, that there would be a ramp up of enforcement of immigration law that could lead to, as you say, millions of individuals being detained? Right. Well, a few answers, Your Honor. So what we're talking about is whether Congress did or didn't impose a legal requirement, a mandatory requirement, on the executive branch to detain. So the presumption is, if Congress told the executive to do it, they would have tried to do it. Maybe they wouldn't have, and it's actually, it's clear, they wouldn't have been able to literally detain millions of people. The system has never been able to accommodate those numbers, but surely it would have tried or made steps towards fulfilling a new detention mandate. And that's why, when Congress enacted 1226C, which is the actual detention mandate it passed in 1996, you know, it understood that it was giving marching orders to the agency, and that's why it delayed implementation. And that's not only in the legislative history. That's in the text of IHRA, IHRA, IHRA Section 303, that delayed implementation, because they understood that this novel detention mandate that was going to require the detention of what they thought 45,000 people a year was a really big deal, and that the executive would make its best efforts, as it always does, to comply with the law. And so, given that context, it is simply implausible to assume that at the same time Congress enacted a detention mandate that would have applied to 2 million people and said nothing about it in the text of IHRA, IHRA, or in the legislative record. And that's also why, in contemporaneous regulations and in 30 years of unbroken practice, the executive has detained people like Petitioner, under 1226, made bond hearings available, detained them when they're flightless and endangered, but released them when they're not on bond. So that is actually the context in history, and the government is engaging a bit of revisionism here when it says, no, in 1996 Congress always wanted to do this, and we've just gotten it wrong for 30 years. It's a big pill to swallow. So unless there are any further questions, Your Honor, we would urge the court to affirm the judgment below. Thank you. All right, Counsel, you have about three and a half minutes. Thank you, Your Honors. Five quick points. I believe the opposing counsel cited to the Jennings case, we think that's actually quite instructive to us. Admittedly, it's dictative, but there's some very useful victor there. As the Supreme Court said in that case, read most naturally, sections 1225B1 and B2 thus mandate detention of applicants for admission until certain proceedings have concluded, end quote, and that's 583 U.S. at 297. So I don't think Jennings is helpful for them, and indeed, there is some pretty cool language supporting the government's interpretation here. Second, I heard opposing counsel outright admit to the differential treatment and perverse results that the interpretation occasions. If you commit the crime of illegal entry, you get more favorable treatment in the form of bond hearings that people that lawfully present at ports of entry do not get. That is also contrary to one of IOWA's central purposes that Congress had in 1996. None of that appears to be disputed. As to subsection A3, we think it creates a very clear logical relationship with its or otherwise language that applicants for admission are necessarily a subset of people seeking admission. That is the only way to interpret that. That's how the courts have widely recognized that, including the Cleaver and the De La Real cases. It's how the Fifth Circuit correctly construed this particular provision just two weeks ago. Fourth, I don't think their interpretation actually avoids surplusage at all. Notably, under their interpretation, the otherwise, use of otherwise or or otherwise in A3 is surplusage. And so is the, in the case of an applicant for admission, surplusage in 1225B. So here, at best, for them, you are faced with competing interpretations that both have surplusage, in which case that the ordinary rule that surplusage must be avoided has far less force. And indeed, the Supreme Court recognized in Barton, sometimes redundancies are quite common when Congress wants to make sure of something, and they wanted to do so here. You know, finally, just, you know, of course, on the plain language of the statute, we agree this is a plain language case. Congress's choice of terms here is quite instructive. Applicant for admission necessarily means you're seeking admission. As the First, as the Fifth Circuit correctly recognized, quote, when a person applies for something, they're necessarily seeking it, end quote. And that alone is sufficient to resolve this case. We certainly appreciate the Court hearing this on such an expedited schedule. That is very much appreciated. And if we can ask the Court's further indulgence, if you are able to issue an opinion quickly, that would be extraordinarily well-received by the government. Certainly, we don't want to intrude on the Court's prerogatives, but to the extent that you wonder if we have a preference, we do. All right. Thank you very much, Counsel. Thank you, Your Honors. Your argument has been very helpful, and the case is submitted, and the Court will render a decision in due course. Madam Clerk, is there anything further this morning? Very well. We will be in recess until further call.